# AFFIDAVIT OF SPECIAL AGENT MICHAEL M. FINNERTY

I, Michael M. Finnerty, having been duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since September of 2001. Previously I worked as a Deputy United States Marshal with the U.S. Department of Justice for approximately three years. My responsibilities include investigating and enforcing the federal firearms laws. From May through August 1998, I attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia where I received training and instruction as a Criminal Investigator, including training involving: firearms, the execution of search and arrest warrants (including Fourth Amendment issues), and investigative techniques. Subsequently, from March 2002 to May 2002, I attended ATF's New Professional Training at FLETC, where I received specialized training and instruction in firearms technology and identification, firearms trafficking, explosives and arson. During my career as a Special Agent, I have participated in the execution of numerous arrest warrants and search warrants. I have also participated in numerous investigations regarding the illegal sale and possession of firearms and ammunition. I have also received training on, and am familiar with, the methods used to determine whether certain firearms or ammunition have traveled in interstate commerce.

2. Based on my training and experience, I am aware that individuals attempt to obtain firearms that have no federally-mandated markings on them (*i.e.,* serial numbers, name of the manufacturer, caliber or gauge of the firearm and or importer markings) to avoid the tracking of firearms by law enforcement. I am also aware that several companies are marketing firearms parts kits to the general public, which are known as "ghost" guns. Ghost guns are firearms made from parts kits which generally lack federally-mandated markings on the parts. Individuals can

purchase various parts from numerous sources and manufacture complete firearms from the parts. I also know that various tools, including without limitation, drills, jigs and presses are needed to complete the firearms.

3. I am currently investigating Terrick Bishoff ("BISHOFF"), born 1981, formerly known as Terrick Gale, and John Shaw ("SHAW"), born 1988, for violations of federal criminal law, including unlawful possession or transfer of a machine gun, in violation of Title 18, United States Code, Section 922(o), possession of an unregistered firearm, in violation of Title 26, United States Code, Section 5861(d), and receipt of possession of a firearm which is not identified by a serial number as required by Subchapter B of Title 26, in violation of Title 26, United States Code, Sections 5861(i) (the "SUBJECT OFFENSES").

4. I submit this Affidavit in support of an application for a criminal complaint charging BISHOFF with unlawful possession or transfer of a machine gun, in violation of Title 18, United States Code, Section 922(o) (the "922(o) Offense").

5. In addition, I submit this affidavit in support of applications for warrants authorizing the search of the following locations (together, the "SUBJECT PREMISES"):

    a.    the premises located at 11 Sherbert Road, Ashburnham, Massachusetts ("the Bishoff Residence"). 11 Sherbert Road, Ashburnham, Massachusetts, as more particularly described in <u>Attachment A</u>, is attached to the residence at 9 Sherbert Road, Ashburnham, Massachusetts. The entire residence at 9-11 Sherbert Road consists of a two-story residence shaped like a "V", with 9 Sherbert Road being on the left as you face the residence, and 11 Sherbert Road being a living area over the garage attached to the right side of the residence. The entire residence at 9-11 Sherbert Road has white siding. The main entrance to 9 Sherbert Road has a pink-colored door in the center of the residence and a peaked roof. 11 Sherbert Road is accessed from exterior wooden stairs leading from the right of the garage door (when viewed from the street) to a windowed-door above the garage. Additional access to 11 Sherbert Road is located through a doorway from the interior of 9 Sherbert Road. A black mailbox is affixed to a post in the front yard, setback a few feet from Sherbert Road. The numbers "9" and "11" are displayed on the door to the mailbox.

b. the premises located at 24 Nyman Road, Templeton, Massachusetts ("the Shaw Residence"). 24 Nyman Road, Templeton, Massachusetts, as, more particularly described in <u>Attachment B</u>, is a two story Cape Cod style residence with a peaked roof, tan siding and a white front door in the center of the residence. The number 24 is displayed to the left of the front door immediately under the front door light. The front of the residence has a wooden deck leading to the front door. For the purposes of this warrant application, the Shaw Residence is defined to include the front and back yards, the driveway, and any vehicles parked on the driveway or in the yards at the time the search is executed..

6. As described herein, I submit that there is probable cause to believe that BISHOFF has committed the 922(o) Offense. I further submit that there is probable cause to believe that (1) the SUBJECT PREMISES contain evidence of a crime, contraband, fruits of crime, or other items illegally possessed, and (2) the SUBJECT PREMISES constitute property designed for use, intended for use, or used in committing the SUBJECT OFFENSES. The items to be searched for and seized are detailed in <u>Attachment C</u>.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and other sources. I have reviewed certain reports prepared by other law enforcement officers regarding their observations and other facts developed during this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and search warrants and does not set forth all of my knowledge about this matter.

## SUMMARY OF THE APPLICABLE LAWS

8. Title 26, United States Code, Chapter 53, known as the National Firearms Act ("NFA") requires that machine guns, destructive devices (*e.g.* hand grenades), and certain other firearms be taxed and registered with the National Firearms Registration and Transfer Record ("NFRTR"), which is maintained by ATF. Title 26, United States Code Section, 5845 defines the firearms to be taxed and registered according to this chapter, including machineguns.

9. Title 18, United States Code, Section 922(o) makes it "unlawful for any person to transfer or possess a machinegun" with limited exceptions that are inapplicable in this case. 18 U.S.C. § 922(o).

10. Title 26, United States Code, Section 5861(d) makes it "unlawful for any person . . . to receive or possess a firearm which is not registered to him in the [NFRTR]." 26 U.S.C. § 5861(d). Title 26, United States Code, Section 5861(i) makes it "unlawful for any person . . . to receive or possess a firearm which is not identified by a serial number as required . . . ." 26 U.S.C. § 5861(i).

11. According to an ATF fact sheet published online, the NFRTR is "the central federal registry of all restricted weapons, including machineguns, as defined in 26 U.S.C. § 5845" (discussed further below).[1] In the registry, ATF's National Firearms Act Division "records a firearm's identification, date of registration and the name and address of the person or entity entitled to legally possess the firearm. Registrations are indexed by name of the registrant and serial number of registered [National Firearms Act] firearms."

12. As used in 18 U.S.C. § 922(o), the term "machinegun" means "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The terms shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such

---

[1] Source: "ATF Fact Sheet – National Firearms Act (NFA) Division" (May 2019), *available at* https://www.atf.gov/resource-center/fact-sheet/fact-sheet-national-firearms-act-nfa-division.

parts are in the possession or under the control of a person." 18 U.S.C. § 921(a)(23) and 26 U.S.C. § 5845(b).

13. As used in 26 U.S.C. §§ 5861(d) and (i), the term "firearm" is defined to include a machinegun. 26 U.S.C. § 5845(a)(6). Violations of §§ 5861(d) or (i) are punishable by up to ten years of imprisonment, a fine, or both, *see* 26 U.S.C. § 5871, and also by forfeiture, *see* 26 U.S.C. § 5872 and 28 U.S.C. § 2461(c).

## TARGETS OF THE INVESTIGATION

14. According to the Massachusetts Registry of Motor Vehicles ("RMV"), as well as credit and utility records from the CLEAR database, BISHOFF resides at 9 Sherbert Road, Ashburnham, Massachusetts, along with Susan Hitchcock-Gale (year of birth 1957), whom I believe to be BISHOFF's mother, Russell Gale Sr. (year of birth 1963), whom I believe to be BISHOFF's father, and Russell Gale Jr. (year of birth 1989), whom I believe to be BISHOFF's brother.

15. According to Ashburnham Police Department, BISHOFF lives at 11 Sherbert Road, which is the apartment over the garage. The Ashburnham Police Department have also described access to the residence at 9 Sherbert Road through an interior doorway inside of 11 Sherbert Road.

16. According to a check of the Massachusetts Criminal Justice Information System ("CJIS") performed on or about September 3, 2019, BISHOFF, Susan Hitchcock and Russell Gale Jr., did not have and have never been issued a license to carry a firearm ("LTC") in the state of Massachusetts. CJIS records reflect that Russell Gale Sr. has been issued more than one LTC in Massachusetts, with the most recent LTC expiring in 1999. A check with the Ashburnham Police Department on September 9, 2019, confirmed that there are no active licenses to carry firearms issued to any of the above referenced residents at 9 – 11 Sherbert Road.

5

17. According to his criminal history, BISHOFF has a pending case in Fitchburg District Court charging him with possession to distribute class A (heroin). During his interactions with an undercover DEA Task Force Officer ("UC") in this case, BISHOFF has stated that he sells fentanyl.

18. According to the Massachusetts RMV and credit and utility records from the CLEAR database, SHAW resides at the SHAW Residence at 24 Nyman Road, Templeton, Massachusetts, along with Gail Shaw (year of birth 1964), whom I believe to be SHAW's mother, John Shaw Sr. (year of birth 1963), whom I believe to be SHAW's father, and Ryan Shaw (year of birth 1997), whom I believe to be SHAW's brother.

19. According to a CJIS check performed on or about September 3, 2019, SHAW Jr., had previously been issued an LTC in Massachusetts which expired in 2014. CJIS records reflect that Shaw Sr. had previously been issued more than one LTC, with the most recent LTC expiring in 2013. CJIS records reflect that Gail Shaw had previously been issued an LTC, which expired in 2007.. CJIS records reflect that Ryan Shaw has never been issued a license to carry firearms.

20. According to his criminal history, SHAW was previously convicted in 2011 of breaking and entering in the night with intent to commit a felony, assault and battery with a dangerous weapon, malicious destruction of property and conspiracy in Winchendon District Court. I understand that these convictions carry a possible sentence of over a year in prison.

**STATEMENT OF PROBABLE CAUSE**

21. In February of 2019, the Massachusetts State Police ("MSP") alerted ATF agents that an individual was selling Glock style "ghost" guns in and around the Fitchburg, Massachusetts area. MSP identified the source of its information and indicated that the individual was a Confidential Source ("CS") working with MSP.

22. The individual selling ghost guns was identified as BISHOFF. During the course of the investigation, ATF utilized the CS as well as the UC. As detailed below, on three separate occasions, ATF made undercover purchases of ghost guns and/or ammunition from BISHOFF. All undercover purchases were recorded using an electronic audio recording device, which also transmitted audio in real-time of the purchases. The second and third purchases also had video recordings.

A. **May 10, 2019 Sale of Firearm and Ammunition**

23. On May 10, 2019 at approximately 3:40 pm, in the presence of the UC, the CS made a consensually recorded telephone call to BISHOFF at telephone number 978-868-3000, the number BISHOFF provided previously to the CS. The CS told BISHOFF that the CS's "friend" (*i.e.,* the UC) wanted to buy a Glock pistol that BISHOFF previously offered to sell to the CS. BISHOFF told the CS that he (BISHOFF) had to go to Gardner[2] to get the firearm and would meet the CS and the CS's friend thereafter.

24. At approximately 4:00 pm, the CS again placed a consensually recorded telephone call to BISHOFF, who told the CS that his source did not have a phone so BISHOFF was planning to go to the supplier's house. BISHOFF also told the CS that the gun was custom made for a silencer and suggested that the CS's "friend" (*i.e.,* the UC) may be able to purchase a silencer for gun.

25. Approximately fifteen minutes later, BISHOFF called the CS and told the CS he had the gun and was on his way to meet the CS.

---

[2] I note that the SHAW Residence is located less than approximately one mile from the Gardner, Massachusetts town line.

26. Approximately thirty-five minutes later, BISHOFF called the CS to say that he was not far away and asked the CS and the CS's friend to meet BISHOFF outside. Surveillance observed BISHOFF arrive in the area driving a white Ford sport utility vehicle with Illinois license plates (the "Illinois Ford").

27. Once outside, the CS and the UC proceed to get into BISHOFF'S vehicle. BISHOFF provided the UC with a Glock style pistol with no identifiable markings (such as a serial number, manufacturer name, caliber of the firearm, or importer markings) on the firearm. BISHOFF told the UC about his own gun, saying he had a .40-caliber with a thirty (30) round magazine. BISHOFF also provided the UC with one (1) magazine and two (2) boxes of ammunition, totaling fifty-four rounds of 9-millimeter ammunition. BISHOFF told the UC that there were no serial numbers on the gun and said the gun was untraceable. BISHOFF indicated he and his supplier had test fired it the day before. BISHOFF also told the UC that his supplier could customize any firearm and make what the UC wanted.

28. BISHOFF told the UC that he had a fully automatic UZI firearm without any serial numbers on it (the "Machinegun") at his house that he would sell to the UC for twenty-five hundred dollars ($2,500.00). BISHOFF told the UC that his supplier buys parts from different places.

29. The UC provided BISHOFF with five hundred and eighty dollars ($580.00) for the Glock style "ghost" gun, magazine and ammunition. BISHOFF provided his telephone number, 978-868-3000 ("BISHOFF's Phone"), to the UC so the UC could contact BISHOFF directly regarding any future sales.

30. ATF requested toll/customer records associated with BISHOFF's Phone from the service provider, T-Mobile. According to the T-Mobile records, the listed subscriber for

BISHOFF's Phone is "Terrick Bishoff."[3] Toll records from BISHOFF's Phone indicate contact with telephone number (978) 407-4895 ("SHAW's Phone") three times on May 10, 2019, between approximately 4:10 pm and 4:12 pm. Between April 13, 2019 and May 4, 2019, BISHOFF's Phone and SHAW's Phone were in telephone contact approximately thirty six (36) times.

31. According to AT&T, the service provider for SHAW's Phone, the subscriber is "John Shaw."[4] "John Shaw" provided telephone number (978) 632-9632 (the "-9632 Number") as the "Contact Home Phone" for the AT&T account associated with SHAW's Phone. Toll records from BISHOFF's Phone indicate two incoming calls from the -9632 Number beginning at approximately 4:10 pm on May 10, 2019 (lasting 3 seconds and 17 seconds respectively), and a third incoming call from the -9632 Number at approximately 4:12 pm lasting approximately 43 seconds. Between April 13, 2019 and June 7, 2019, BISHOFF's Phone was in contact with the -9632 Number approximately thirty seven (37) times.[5]

32. On May 13, 2019, the UC exchanged text messages with BISHOFF regarding the Machinegun (referred to in the texts as the "U"), including the following exchange:

UC: *"I wanted to talk to you about the U . . . is it still available?"*

---

[3] According to the T-Mobile records, BISHOFF obtained the (978) 868-3000 number in approximately August 2016. At that time, BISHOFF listed a residential address of 66 Rolling Acres Road, Lunenburg, Massachusetts.

[4] According to the AT&T records, SHAW obtained the (978) 407-4895 number in approximately May 2004. At that time, SHAW listed a residential address of 184 Popple Camp Road, Petersham, Massachusetts. Based upon CLEAR records, it appears that the Petersham address may have been a prior address for SHAW.

[5] On May 21, 2019 and July 18, 2019, this Court allowed applications for a pen register and trap and trace device for BISHOFF's Phone. *See* 19-mj-4275-DHH. On May 24, 2019 and July 18, 2019, this Court allowed applications for a pen register and trap and trace device for SHAW's Phone. *See* 19-mj-4276-DHH.

| | | |
|---|---|---|
| BISHOFF: | | *"Yes"* |
| UC: | | *"Is it full rock and roll? An [sic] what about numbers?"* |
| BISHOFF: | | *"Yes . . . 2500"* |
| UC: | | *"No numbers?"* |
| BISHOFF: | | *"No"* <br> *"None"* |
| UC: | | [thumbs up emoji] <br> *"Are you locked in at 25? Any wiggle room"* |
| BISHOFF: | | *"Yes . . . . . and not my price"* |

Later in the text exchange, the UC texted BISHOFF *"Btw I may be in the market for another g as well, we will talk Weds"* referring to the Glock ghost gun previously purchased. BISHOFF responded *"K."*

    **B**.    **May 15, 2019 Machinegun Sale**

    33.    On May 15, 2019, the UC communicated via text message with BISHOFF regarding the purchase of the Machinegun, and the two agreed to meet in Fitchburg, Massachusetts. Surveillance units observed BISHOFF arrive in the area driving the Illinois Ford. The UC entered the front passenger seat of BISHOFF'S vehicle and BISHOFF drove a short distance with the UC to a cemetery. At the cemetery, the UC and BISHOFF exited the vehicle and went to the back hatch where BISHOFF retrieved the Machinegun. BISHOFF told the UC that there were no numbers on it and also stated that he (BISHOFF) did not build it. BISHOFF told the UC that he (BISHOFF) fired the Machinegun earlier in the day near his house in the woods in Ashburnham.

    34.    The UC provided BISHOFF with the agreed upon price of $2,500.00 for the Machinegun and a twenty-five (25) round magazine. BISHOFF told the UC that his supplier was building him another machinegun and that is why he gave up the Machinegun.

35. BISHOFF and the UC also discussed types of firearms BISHOFF's supplier could supply. BISHOFF informed the UC he could obtain full auto ARs and then showed a photo on his (BISHOFF's) phone to the UC of an AR that he (BISHOFF) said belonged to him and that he obtained from his supplier.

36. The UC asked BISHOFF about a silencer for the pistol the UC purchased on May 10, 2019. The UC asked BISHOFF to get a price on the silencer and asked how long it would take to get it. BISHOFF stated he did not know but he was going to see his supplier in a few minutes and would talk to him about prices and get back to the UC.

37. Surveillance followed BISHOFF from the meeting with the UC to the SHAW Residence where BISHOFF was observed speaking with a white male outside the residence.

C.  **July 18, 2019 "ghost" gun discussion**

38. On July 18, 2019, the UC and BISHOFF met in Fitchburg. BISHOFF was driving a different vehicle than the Illinois Ford. During the meeting, BISHOFF informed the UC that his supplier was making assault rifles ("ARs") to sell and that the ARs would not have serial numbers on them. During the meeting, BISHOFF also showed the UC a Glock style "ghost" gun that BISHOFF retrieved from the center console of his vehicle, a Volkswagon Sport Utility Vehicle. BISHOFF told the UC that the firearm was a Glock 26 and offered to sell it to the UC for eight hundred ($800.00) dollars. BISHOFF told the UC there were no numbers on it (meaning no serial numbers) and told the UC that he (BISHOFF) had two of them. BISHOFF also talked to the UC about other guns he (BISHOFF) had.

D.  **July 24, 2019 firearm sale**

39. On July 24, 2019, the UC met with BISHOFF to purchase the Glock style "ghost" pistol they discussed on July 18, 2019. The meeting was arranged between text messages

11

between the UC and BISHOFF. BISHOFF arrived at the meeting driving a grey Dodge Journey with Maryland plates. The UC asked BISHOFF why he had a different vehicle and BISHOFF responded that he changes vehicles approximately every two weeks.

40. During the meeting, BISHOFF provided the UC with a Glock style "ghost" gun which BISHOFF explained was not the same one he (BISHOFF) showed previously to the UC, but was similar. The UC provided BISHOFF with the agreed upon price of eight hundred ($800.00) dollars for the firearm and one (1) magazine.

41. During the meeting, the UC and BISHOFF discussed the silencer and the AR that they previously spoke about. BISHOFF told the UC that he was going to see the supplier after the meeting so he could provide the supplier with some money to order the parts for the AR. BISHOFF told the UC that his supplier would be done making an AR for BISHOFF in a couple of weeks, and once it was completed, he (BISHOFF) would show the UC the gun and the UC could order the same thing if he wanted. BISHOFF told the UC that the AR would be full auto and would not have any numbers on it.

42. During the meeting, BISHOFF also told the UC that his supplier orders kits or parts to "make the stuff [he] can't order." BISHOFF also talked to the UC about seeing news reports about people "constantly getting busted with guns . . . without serial numbers." BISHOFF explained that he was getting what he could before authorities started cracking down on it.

43. Surveillance followed BISHOFF from the meeting with the UC. BISHOFF first met with an individual near the South Gardner Hotel and then proceeded to the SHAW Residence.

### E. Review of SHAW'S Pay-Pal Account

44. During the course of this investigation, investigators requested records and accounts from PayPal associated with SHAW. According to the records received from PayPal, between September 13, 2018 and May 19, 2019, SHAW ordered approximately thirty (30) various parts for firearms, including without limitation, Glock slides, Glock trigger mechanisms, Glock full auto slide plate switches, Glock barrels, Glock magazines, freeze plugs (commonly used in homemade silencers) and Glock front and rear sights.

45. According to the United States Postal Service, SHAW receives mail at Post Office Box 236 in Templeton, Massachusetts. Records received from PayPal list both the 24 Nyman Street address as well as the post office box. According to the UPS driver who delivers to that address, packages are delivered to the physical 24 Nyman Street address.

### F. Review of ATF Federal Firearms License and Firearms Queries

46. A query on or about May 21, 2019 to the Massachusetts Firearms Ownership registry revealed that SHAW had three firearms registered to him that he had purchased in 2006, 2007, and 2009.

47. A query on or about September 3, 2019, by ATF Industry Operations Investigators determined that neither SHAW nor BISHOFF have a Federal Firearms License. On the same date, ATF Industry Operations Investigators queried the NFRTR database and determined that neither SHAW nor BISHOFF have any weapons registered with the NFRTR.

### G. ATF Analysis of May 10, 2019 and May 15, 2019 Purchases

48. On May 22, 2019, I sent the Glock style "ghost" gun purchased by the UC on May 10, 2019 and the Machinegun purchased by the UC on May 15, 2019, to the ATF Firearms Technology Criminal Branch located in Martinsburg, West Virginia for a device determination.

ATF Technology Branch determined that the item purchased on May 10, 2019 is a firearm as described by the Gun Control Act ("GCA") of 1968, Title 18 U.S.C. § 921(a)(3), and that the item purchased on May 15, 2019 is an NFA weapon as defined by 26 U.S.C Section 5845(a) and meets the definition of a machinegun as defined by 26 U.S.C. Section 5845(b). Both weapons were successfully test fired and are considered firearms under 18 U.S.C. Section 921(a)(3)(A). ATF Technology Branch did not find any serial numbers or identification on either weapon as required by 26 U.S.C. Section 5842.

## Seizure of Computer Equipment and Data

49. Based upon my knowledge, training, and experience, and from the PayPal records reviewed during this investigation, I know it is both possible and common for people to procure firearms and firearm components, such as frames, barrels, receivers, sears, ammunition or magazines, through online purchases, either from legitimate retail websites or from online black market vendors. I further know that, when a person places online retail orders, the retailer typically sends a confirmatory e-mail—an electronic receipt—to an e-mail address provided by the purchaser. In addition, I know that internet browsers generally maintain browsing history as a default and that it generally takes an action on the part of the user to switch that default. Finally, I know from my experience that it is common for people to keep their personal computers, including smartphones, in their homes and to use them to make online purchases and to check their e-mail.

50. Based on my training and experience and on the facts of this case, I believe it is likely that that the SUBJECT PREMISES will contain at least one electronic device that can be unlocked using a fingerprint or similar biometric in lieu of a password. I know, for example, that both Apple and Samsung, two of the most popular makers of smart phones and tablet devices

sold in the United States, have incorporated this capability into their smart phones and tablets for the past several years. In general, if a user enables the fingerprint unlocking capability (called "Touch ID" in Apple devices), he or she can register one or more fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing one of the registered fingers to a sensor on the device. In my experience, users of devices with this fingerprint unlocking capability often enable the capability on the devices because it is often considered a more convenient way to unlock the device than by entering a passcode. It may also be considered a more secure method of protecting the contents of the device than the use of a passcode.

51. In some instances, a fingerprint cannot be used to unlock a device that has enabled the fingerprint unlocking capability, and a passcode must be used instead. Those circumstances commonly include situations in which (1) a designated period of time has elapsed since the device was last unlocked (48 hours in the case of Apple devices) or was last unlocked with a passcode; (2) the device has not been unlocked since last being switched on; (3) the device has a received a remote lock command; or (4) a designated number of unsuccessful attempts have been made to unlock the device using a fingerprint (in the case of Apple devices, 5 unsuccessful attempts). For that reason, in the event law enforcement encounters an electronic device with this capability, the opportunity to unlock the device using a fingerprint exists only for a short time.

52. The passcodes that would unlock any electronic devices found in the SUBJECT PREMISES are not known to law enforcement. Thus, it will likely be necessary to press the finger or fingers of BISHOFF (for any device located at 11 Sherbert Road, Ashburnham, Massachusetts, including without limitation on BISHOFF's person), or SHAW (for any device

located at 24 Nyman Road, Templeton, Massachusetts, including without limitation on SHAW's person) to the devices' sensors in an attempt to unlock those devices for the purpose of executing the search authorized by this warrant. Attempting to unlock the devices in this fashion is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

53. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.

54. For those reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of (1) Terrick BISHOFF (for any device located at 11 Sherbert Road, Ashburnham, Massachusetts, including without limitation on BISHOFF's person), or (2) John SHAW (for any device located at 24 Nyman Road, Templeton, Massachusetts, including without limitation on SHAW's person) to the sensor of any locked electronic device found during the search of the SUBJECT PREMISES for the purposes of attempting to identify the user of the device and unlocking the device in order to search the contents as authorized by this warrant.

55. Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or

years after they have been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

   a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

   b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

   d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed internet pages or if a user takes steps to delete them.

56. Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

a. The volume of evidence – Storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b. Technical requirements – Analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

57. The SUBJECT PREMISES may contain computer equipment whose use in the crimes or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant. If the things described in <u>Attachment C</u> are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

58. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in <u>Attachment C's</u> definition of "computer hardware") can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Smart phones have the ability to browse the internet and, like a computer, store evidence of the browsing history of the user, including evidence of internet searches. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**************************************************************************

## CONCLUSION

59. Based on all of the foregoing, I submit that there is probable cause to believe that BISHOFF has committed the 922(o) Offense. I submit that there is also probable cause to believe that evidence of the commission of criminal offenses, contraband, fruits of crimes and things otherwise criminally possessed, as well as property designed and intended for use, and that has been used, as a means of committing the SUBJECT OFFENSES, as described in Attachment C, are located at the SUBJECT PREMISES, as more fully described in Attachments A and B, and request that the Court issue the requested search warrants.

Sworn to under the pains and penalties of perjury,

_____
Special Agent Michael M. Finnerty
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me this 23rd day of September, 2019.

_____
Honorable David H. Hennessy
Chief United States Magistrate Judge